UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRENDA GAINES HUNTER,

Plaintiff,

v.

CRYSTAL NOEL CARTER, MARK HAWK, PERMANENTE MEDICAL GROUP, KAISER FOUNDATION HEALTH PLAN, INC., and KAISER FOUNDATION HOSPITAL,

Defendants.

No. 2:25-cv-2076 DAD AC PS

ORDER AND FINDINGS AND RECOMMENDATIONS

Plaintiff is proceeding in pro se, and the case was accordingly referred to the undersigned by E.D. Cal. 302(c)(21). Plaintiff initially requested leave to proceed in forma pauperis ("IFP") (ECF Nos. 2-3, 6), but the request was mooted upon plaintiff's payment of the filing fee. See 28 U.S.C. § 1915(a)(1).

The complaint alleges tortious conduct involving plaintiff's medical information and in relation to previous state court litigation, as well as constitutional violations and a RICO conspiracy, against various Kaiser Permanente health care entities and two Kaiser physicians. All defendants except Dr. Mark Hawk[1] filed a motion to dismiss on December 23, 2025. ECF No.

[1] Dr. Hawk had not yet been served at the time the motion was filed. ECF No. 18 at 13.

18. Plaintiff opposed the motion (ECF No. 20), defendants replied (ECF No. 21), and plaintiff applied for leave to file a surreply (ECF No. 22). Dr. Hawk later appeared and filed a separate motion to dismiss on March 2, 2026. ECF No. 30. This motion has also been fully briefed, including another application by plaintiff for leave to file a surreply. ECF Nos. 30, 32-35.

For the reasons set forth below, the undersigned recommends that both motions to dismiss be granted.

## I. Background

### A. Factual Allegations

The 99-page complaint alleges by way of background that plaintiff sued her original physician, Dr. Nayak of the University of California at San Francisco ("UCSF"), but dropped the suit following various rulings in the San Franciscos Superior Court. ECF No. 1 at 3, 31. Dr. Nayak had refused to diagnose plaintiff with lupus until Dr. Nayak's supervisor compelled such a diagnosis and related treatment in August 2015. Id. at 31, 34-35.

Roughly one year after dropping the suit, in 2017, plaintiff decided to enroll in Kaiser Permanente as a Medicare Advantage Plan member. Id. at 5, 20, 30. Under the guise of being thorough, her initial Primary Care Physician ("PCP"), Dr. Tijuana Jackson, consulted Dr. Nayak instead of just reviewing plaintiff's medical record. Id. at 31. Dr. Nayak used the conversation to portray plaintiff's prior lawsuit as a baseless attempt at extortion, a narrative Dr. Jackson then spread among Kaiser physicians. Id. at 31-32. Dr. Nayak also told a Kaiser rheumatologist, Dr. Adhikesavan, that plaintiff did not have lupus. Id. at 31, 35. In retaliation for the suit against Dr. Nayak, Dr. Adhikesavan chose to believe Dr. Nyak over her supervisor's lupus diagnosis, and refused to prescribe plaintiff hydroxychloroquine during the COVID-19 pandemic as a result. Id. at 34-35.

In late 2017, plaintiff was instructed to go to Kaiser's Fair Oaks office, where she randomly chose defendant Dr. Crystal Carter as her rheumatologist. Id. at 33. During an appointment in 2021, Dr. Carter made a gesture that seemed to make fun of the fact that plaintiff's mother was a prostitute. Id. at 27-28. Plaintiff took a year and a half to emotionally recover enough to visit Dr. Carter's office again, and this partly led plaintiff to disbelieve her

medical advice ever since. Id.

On August 22, 2023, plaintiff woke up with facial tingling and muscle loss. Id. at 21. Dr. Carter told her to go to the emergency room because it might be a stroke. Id. at 22. Imaging revealed white matter changes and a C1 fracture, but with instructions only to see her PCP in a few days. Id. at 22. Plaintiff did schedule this appointment, but later cancelled it based on an independent readthrough of the CT and MRI report from the emergency room visit. Id. at 22-23. This readthrough led her to suspect she might have lupus based on the presence of white matter in the scans, which some independent sources asserted could be caused by lupus. Id. at 22-23.

Plaintiff complained of facial twitching, breathing, and possibly nerve damage in the right foot over the next two years. Id. at 23. She emailed Dr. Adhikesavan, who told her to tell Dr. Carter. Id. Once Dr. Carter said she could not diagnose lupus, however, plaintiff concluded that she needed to research her symptoms and diagnose herself. Id. at 24.

As to the C1 fracture in the MRI report, plaintiff asked Dr. Carter if she had a broken neck. Id. at 25. Pursuant to Dr. Carter's instructions, plaintiff resent the CT scan report and underwent a second CT scan on October 16, 2023. Id. at 25-26. Dr. Carter told her during the October 16 appointment that the fracture "may" be congenital, but plaintiff's own research told her a radiologist can tell if so from the scans. Id. at 26-27. Dr. Carter also said that the fracture had healed, despite plaintiff's research suggesting chronic fractures do not heal without help. Id. at 29. Dr. Carter also said plaintiff could continue her sporting activities, and plaintiff decided not to let on that she did not believe her. Id. at 27, 29.

On October 19, 2023, Dr. Carter sent a message offering to consult with a specialist. Id. at 29. She then retroactively changed the message to read that she had consulted with the specialist, who also said that whatever fracture was in the vertebrae had healed. Id. at 30. Dr. Carter also asserted the radiologist had recommended certain types of x-rays. Id. Plaintiff did not have them done because the medical literature she had reviewed only recommended them when there was a known structural defect. Id. Plaintiff would not learn that she did in fact have a chronic C1 vertebral fracture until a November 2024 independent consultation with a neurosurgeon in Reno, Nevada. Id. at 57.

In November 2023, plaintiff sent Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospital, and the Permanente Medical Group, Inc. (collectively "Kaiser") and Dr. Carter 364 letters outlining the allegations of misconduct thus far. Id. at 35. Defendants failed to respond to these letters, and failed to produce reports from the spine specialist Dr. Carter had purportedly consulted about plaintiff's October 2023 CT scans. Id. In January 2024, Dr. Carter did not respond to plaintiff's inquiry as to whether she could return to work as a personal trainer for older individuals, despite plaintiff needing medical clearance to do so. Id. at 36.

In March 2024, plaintiff filed suit against Kaiser, Dr. Carter, and Permanente in the Sacramento County Superior Court, Hunter v. Carter et al, Case No. 24CV0Q5936. Id. at 36. Later that day, plaintiff received a letter from Kaiser asserting that because she had been deemed "threatening", she could no longer be on campus without prior notice to security. Id. at 36-37. The letter did not explain how she was threatening or clarify what campus Kaiser was referring to, and Kaiser must have prepared the letter before plaintiff filed suit. Id. The complaint therefore interprets the letter as the next step in the ongoing pattern of retaliation for the suit against Dr. Nayak. Id. at 37.

Plaintiff's efforts to obtain evidence needed both in her state court case and in drafting this complaint were frustrated by defendants' conduct. Id. at 38. Plaintiff alleges, for example, that they violated the Health Information Portability and Accountability Act ("HIPAA") both by altering medical records and by denying access to audit trails that would reflect such edit history. Id. at 38-40. Defendants have refused multiple requests for these audit trails since October 2025 based on "vague HIPAA-related justifications that lacked clear legal basis or specificity." Id. at 41. The medical records also contain no trace of the original text, whereas HIPAA requires that any edits preserve the original by crossing it out rather than deleting it entirely. Id. at 40-41.

Interlocutory decisions in plaintiff's state court case further frustrated her efforts to obtain the requested metadata, despite how crucial it was to plaintiff's claims. Id. at 45. The original judge was forced to recuse herself from the case due to her prior representation of Kaiser, as well as her husband's current representation of Kaiser on other matters. Id. at 43. Plaintiff then received a tentative decision denying her motion to compel production of the targeted audit logs,

before she even received notice of which judge would now preside over the case. Id. at 44. The complaint alleges that these procedural barriers to discovery effectively impaired plaintiff's constitutional right to meaningful access to judicial process. Id. at 46-47.

At some point before or during the pendency of the state court litigation, Kaiser led plaintiff to belief that Dr. Mark Hawk, who was not a defendant, was the specialist Dr. Carter had consulted in October 2023. Id. at 52. Based on Cal. Code of Civ. P. section 1987(a)'s requirement that third-party subpoenas shall be served in the same way as summons on a party, plaintiff attempted to serve Dr. Hawk personally. Id. at 48. Despite Dr. Hawk not being a party to the action, Kaiser insisted that any subpoenas for him be served on Kaiser's attorneys. Id. Plaintiff moved to compel subpoena service on Dr. Hawk himself, but the court ruled on May 1, 2025 that plaintiff had to accept counsel's declaration that it was authorized to receive service on Dr. Hawk's behalf. Id. at 48-49.

Plaintiff subsequently filed a demurrer and a motion for an adverse inference based on Dr. Hawk's failure to appear as a witness. Id. at 49, 51. The latter motion included a February 2025 letter from Kaiser returning plaintiff's check for Dr. Hawk's appearance fee, which plaintiff interpreted as saying that Dr. Hawk would not appear. Id. at 51-52; ECF No. 1-1 at 3. As to the demurrer, defendants admitted in their response that their answer only included general denials to the complaint. ECF No. 1 at 49-50. The Superior Court ruled that res ipsa loquitur applied to the claims, meaning that defendants had the burden of rebutting the presumption of negligence. Id. at 50. Despite this standard, and the fact that general denials do not meet it, the court denied plaintiff's motion in May 2025. Id. at 51-52. It also denied the motion for adverse inference, holding that plaintiff had not proven that defendants had in fact blocked service on Dr. Hawk. Id. at 51-52.

Only after the denial of these motions did the state court defendants inform plaintiff that they considered all subpoenas withdrawn. Id. at 52; ECF No. 1-1 at 141. They also admitted on May 6, 2025, that Dr. Hawk never made a record of any consultation between himself and Dr. Carter. ECF No. 1 at 52; ECF No. 1-1 at 5. Defendants did not clarify whether this consultation had nevertheless occurred, in which case the failure to document it was still a HIPAA violation.

ECF No. 1 at 52. In any case, the denial of plaintiff's motions ultimately left her unable to gather the evidence needed to pursue her claims, and therefore caused her to dismiss the case. Id. at 81.

B. The Complaint's Causes of Action

Count I: "Fraudulent Concealment of Medical Information (Emotional-Injury Based)"

The complaint first asserts that the failure to provide any records of Dr. Carter's supposed consultation with a specialist, despite multiple requests, violates plaintiff's right to access her own complete medical record under 45 C.F.R. § 164.524 and California Health and Safety Code § 123100. Id. at 55-56. Defendants then compounded this failure with evasive discovery responses under Cal. Code of Civ. P. § 2031.310 by providing plaintiff with large volumes of irrelevant metadata. Id. at 57.

Count Two: "Gross Negligence and Presumed Negligence (Res Ipsa Loquitur) Based on Medical Record Mismanagement"

The second cause of action, for negligence, asserts that defendants breached their duty under HIPAA to create any record of the consultation between Dr. Carter and any specialist. Id. at 58-59 (citing 45 C.F.R. § 164.306; Cal. Bus. & Prof. Code §§ 2266, 2262). Alternatively, the claim again asserts plaintiff's right under 45 C.F.R. § 164.524 to access her Protected Health Information ("PHI"), if such consultation did occur. Id. at 59-60. In either case, the claim also targets defendants' failure under 45 C.F.R. § 164.312 to preserve audit trails for plaintiff's electronic PHI ("ePHI"). Id. at 59.

Count Three: Intentional Infliction of Emotional Distress

As to every defendant except Dr. Hawk, plaintiff argues that denying her access to ePHI, burying her in irrelevant metadata when responding to her discovery request, generally frustrating her efforts to obtain appropriate medical care, and Dr. Carter lying about having consulted Dr. Hawk to begin with, constituted the intentional infliction of emotional distress. Id. at 62-64. Plaintiff is particularly vulnerable because of her lupus, which tends to flare in response to stress, and experienced symptoms of Stage 3 Chronic Kidney Disease during her November 2024 consultation. Id. at 64. Plaintiff asserts that the Superior Court's refusal to compel compliance with service of subpoenas on Dr. Hawk converts defendants' conduct during discovery into

actions taken under color of law, thereby subjecting them to jurisdiction under 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations ("RICO") Act. Id. at 65. Unrelatedly, plaintiff cites Dr. Nayak sharing confidential information, the nature of plaintiff's suit against her, with Dr. Jackson and Dr. Adhikesavan when it was irrelevant to plaintiff's care. Id. at 65.

Claim Four: "Breach of Contact (Healthcare Agreement)"

Fourth, plaintiff asserts that Kaiser and Permanente breached an implicit contract to provide competent medical care for her spinal injury, particularly by failing to record whether Dr. Carter consulted a specialist about it and withholding information about plaintiff's treatment. Id. at 67-68.

Claim Five: Civil Rico and Civil Rights Violations Under 42 U.S.C. §§ 1983 and 1985

The fifth claim again relies on the dissemination of a false narrative about plaintiff's suit against Dr. Nayak. Id. at 70-71. Plaintiff further alleges that Kaiser notifying her that Dr. Hawk would not appear despite her subpoena, without formally moving to quash it, reflects efforts to fraudulently conceal the truth and therefore constitutes obstruction of justice and witness tampering under 18 U.S.C. §§ 1503 and 1512. Id. at 72-73. Other predicate activity under RICO includes wire and mail fraud based on the concealment of a fractured C1 vertebrae and the misrepresentation of plaintiff's medical records, and retaliation through both such restricted access and labeling plaintiff as too threatening to be on Kaiser grounds without prior notice. Id. at 74-75. Plaintiff states that although HIPAA does not provide a private right of action, defendants exploited both this lack of direct enforcement and the ability thereunder to share PHI between providers "to further fraudulent concealment and retaliation[.]" Id. at 77. The Kaiser defendants acted under color of law both because the Superior Court endorsed their frustration of discovery, and because they acted "within the scope of their authority as a federally-regulated Medicare Advantage Plan provider." Id. at 71-72.

Claim Six: "Procedural Due Process Violation (14th Amendment)"

Plaintiff alleges she was denied due process by defendants' denial of relevant audit logs, burying plaintiff in irrelevant metadata, and refusing to produce Dr. Hawk in compliance with the subpoena. Id. at 81-84. These actions effectively prohibited plaintiff from accessing information

critical to her state case, thereby compelling her to dismiss it. Id. at 81. Plaintiff asserts that this conduct also violated HIPAA, particularly as defendants expressed confusion as to the difference between audit trails and audit logs when both are defined by statute and industry standards alike. ECF No. 1 at 82. Plaintiff again acknowledges that HIPAA does not provide a private right of action, but argues that its standards for access, disclosure, and integrity of medical records are what connect the state medical malpractice claims and the federal claims. Id. at 85.

Claim Seven: "First Amendment Violation – Right to Petition the Government"

The seventh claim, asserted against all defendants but Dr. Hawk under § 1983, alleges that the barriers to discovery outlined in the complaint infringed plaintiff's First Amendment right to petition the government for redress. Id. at 86-88.

Claim Eight: Fraudulent Concealment Based on Obstruction of State Court Discovery and Subpoena Service

The eighth and final claim also rests on defendants' alleged misconduct in relation to plaintiff's previous state court lawsuit. Id. at 89-92.

C. Prayer for Relief

Plaintiff seeks damages for emotional distress and psychological harm; compensatory damages for economic and non-economic losses; punitive and exemplary damages; declaratory relief holding that defendants violated plaintiff's rights via obstruction of justice, fraudulent concealment, retaliation, and interference with access to courts; an injunction compelling the production of complete medical records, audit logs, and metadata per plaintiff's previous request; an injunction enjoining any future retaliatory and obstructive conduct regarding the propounding of subpoenas or discovery; and attorney's fees and costs Id. at 95-98.

## II. Motions Before the Court

Dr. Carter and the Kaiser entity defendants move to dismiss this action based on grounds including the statute of limitations applicable to medical malpractice claims, the litigation privilege, the Rooker-Feldman and Noerr-Pennington doctrines, the failure to adequately plead fraud by concealment, the failure to include adequate facts about the predicate acts or injury underlying plaintiff's RICO claim, the lack of a private right of action under HIPAA, and the

failure to establish liability as a state actor under 42 U.S.C. § 1983. ECF No. 18. Plaintiff opposed the motion, defendants replied, and plaintiff sought leave to file a surreply. ECF No. 20 through 22.

Dr. Hawk filed a separate motion to dismiss on many of the same grounds, and also arguing that the litigation privilege applies to him even though he was not named as a defendant in the state court action. ECF No. 30. Plaintiff opposed this motion, Dr. Hawk replied, and plaintiff moved for leave to file a surreply. ECF Nos. 32 through 35. All motions were taken under submission without oral argument. ECF Nos. 28, 36.

The court will DENY plaintiff's motions for leave to file surreplies, as defendants' closing briefs did not introduce any new grounds for dismissal as to which a surreply would arguably be appropriate. See Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996). Plaintiff's contentions regarding "new" evidence and arguments are unfounded.

## III. Analysis

### A. Legal Standards Governing Motions to Dismiss

"The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint." N. Star Int'l v. Ariz. Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).

In order to survive dismissal for failure to state a claim, a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" it must contain factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). It is insufficient for the pleading to contain a statement of facts that "merely creates a suspicion" that the pleader might have a legally cognizable right of action. Id. (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-35 (3d ed. 2004)). Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In reviewing a complaint under this standard, the court "must accept as true all of the factual allegations contained in the complaint," construe those allegations in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007); Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010), cert. denied, 564 U.S. 1037 (2011); Hebbe v. Pliler, 627 F.3d 338, 340 (9th Cir. 2010). However, the court need not accept as true legal conclusions cast in the form of factual allegations, or allegations that contradict matters properly subject to judicial notice. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.), as amended, 275 F.3d 1187 (2001).

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. See Fed. R. Civ. P. 15(a); Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied ... if amendment would be futile." Carrico v. City & County of San Francisco, 656 F.3d 1002, 1008 (9th Cir. 2011).

**B. Plaintiff Cannot State Any Claim Against Any Defendant Under Section 1983**

42 U.S.C. § 1983 provides a cause of action against persons who violate federal rights "under color of state law." The statute thus, by its terms, creates liability for state and local government actors. See West v. Atkins, 487 U.S. 42, 48 (1988). Private individuals and entities may be sued under § 1983 only when their conduct is "fairly attributable to the state." Id. at 49; see also Brentwood Academy v. Tenn. Secondary School Athletic Assoc., 531 U.S. 288, 295 (2001) ("[S]tate action may be found if, though only if, there is such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the state itself."). Liability on the part of private parties requires action "under color of state law"

pursuant to a judicially-recognized theory such as joint action with state officials or the performance of a state's governmental functions. See Brunette v. Humane Society of Ventura County, 294 F.3d 1205, 1209-1210 (9th Cir. 2002).

Here, plaintiff's theories of state action fail. First, "a private doctor or hospital cannot be deemed a state actor merely because they are recipients of state or federal funding" or subject to governmental regulation. Jackson v. East Bay Hospital, 980 F.Supp. 1341, 1357 (N.D. Cal. 1997) (citing Mendez v. Belton, 739 F.2d 15, 18 (1st Cir.1984)); see also Taylor v. St. Vincent's Hospital, 523 F.2d 75, 77 (9th Cir. 1975) (refusing to find a hospital acted under color of state law based on "the enjoyment by the hospital of tax exemptions, its regulation by the state and its performance of a public function"). Accordingly, plaintiff's reliance on Kaiser's Medicare contract and HIPPA obligations, ECF No. 20 at 13, is unavailing. Moreover, Medicare is a federal benefits program and HIPAA is a federal statute. Liability under § 1983 turns on action under color of *state* law, and does not lie for actions under color of federal law or in conjunction with federal authorities. See Stonecipher v. Bray, 653 F.2d 398, 401 (9th Cir. 1981) (federal agency cannot be sued under § 1983 because its agents perform no acts under color of state law).

Second, the defendants' engagement in litigation after having been sued by plaintiff in state court does not render them joint actors with the state judiciary. Plaintiff argues that defendants conspired with the state courts and therefore acted under color of state law. See ECF No. 20 at 13, ECF No. 32 at 9. This theory fails. "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002). "To prove a conspiracy between the [state] and [the private party] under § 1983, [the plaintiff] must show an agreement or meeting of the minds to violate constitutional rights." Id. (cleaned up). The complaint does not plausibly allege any meeting of minds between the defendants and the state court to deprive plaintiff of her rights. That the state court ruled in defendants' favor on some matters does not support an inference of a common objective to harm plaintiff.

All the defendants here are private parties. It is perfectly clear that no defendant was acting on behalf of the state or any municipality, purporting to exercise public authority, or acting

in concert with state officials to perform a state function. Accordingly, they were not acting "under color of law." Plaintiff's § 1983 claims—Claims Six (due process) and Seven (First Amendment)—therefore fail to state claims for relief and must be dismissed.

**C. Plaintiff Has Not Stated a Civil RICO Claim**

Claim Five is asserted primarily under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). ECF No. 1 at 69. The elements of a civil RICO claim are that "a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt. In addition, the conduct must be (5) the proximate cause of harm to the victim. To show the existence of an enterprise under the second element, plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish this purpose." Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014) (internal citations omitted).

The allegations of the complaint fail to establish any racketeering activity, let alone a pattern of it. In opposition to the motions to dismiss, plaintiff argues that the actionable racketeering activity consists of "acts of mail and wire fraud directly impacting the integrity of the federal Medicare program." ECF No. 20 at 13. Specifically, she contends that "Defendants' years-long harassment campaign was effectuated through the manipulation of federally mandated electronic health record (EHR) metadata and audit trails" and that defendants "intentionally misrepresent[ed] medical data to a Medicare recipient to avoid financial responsibility for a catastrophic spinal injury[.]" Id. Mail and wire fraud, however, "require the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception." United States v. Miller, 953 F.3d 1095, 1102 (9th Cir. 2020) (emphasis in original). Plaintiff does not allege—nor could she plausibly allege, given the nature of the underlying dispute—that defendants were attempting to deprive her of money or property by means of deception.

Even if defendants intentionally concealed a vertebral fracture, suppressed information about a neurological consultation, and obstructed plaintiff's efforts to obtain records, see ECF No.

20 at 6, that would not constitute fraud or any other cognizable predicate offense under RICO.[2] Conclusory use of the words "fraud" and "fraudulent" are insufficient to state a claim. Accordingly, the claim fails. It is unnecessary to address the other elements of RICO liability.

To the extent that Claim Five relies on 42 U.S.C.§ 1983, it fails for the reasons explained above in relation to Claims Six and Seven. To the extent it invokes 42 U.S.C. § 1985(2) and (3), ECF No. 1 at 73, it fails because that statute addresses conspiracies to deprive citizens of equal rights on the basis of race or membership in a protected class. See Bretz v. Kelman, 773 F.2d 1026, 1028 (9th Cir. 1985); Cassettari v. Nevada County, 824 F.2d 735, 739-40 (9th Cir. 1987). The complaint here involves no allegations of race-based or other invidious discrimination. Accordingly, § 1985 has no application.

The motions to dismiss must be granted as to Claim Five on grounds of failure to state a claim.

**D. Leave to Amend the Federal Causes of Action Is Not Appropriate**

Leave to amend should be granted if it appears possible that the defects in the complaint could be corrected, especially if a plaintiff is pro se. Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc). If it is clear that a complaint cannot be cured by amendment, however, the court may dismiss without leave to amend. Cato v. United States, 70 F.3d 1103, 1105-06 (9th Cir. 1995). Here, amendment of the federal claims would be futile. Given the nature of the dispute, the allegation of additional facts could not result in a plausible theory of action under color of law as required to support § 1983 claims, or demonstrate the existence of a RICO conspiracy. Accordingly, plaintiff should not be granted leave to amend her federal causes of action.

////

////

[2] In opposition to dismissal, plaintiff emphasizes that the gravamen of her complaint is "fraudulent concealment" and "obstruction" rather than medical malpractice. ECF No. 20 at 5. While the court understands that plaintiff is suing not for medical malpractice but over the alleged withholding of information and manipulation of data, that does not mean that she can state a legally viable claim for fraud.

**E. The Court Should Decline Supplemental Jurisdiction Over State Law Claims**

Because plaintiff's federal causes of action must be dismissed without leave to amend, the court's exercise of supplemental jurisdiction over the remaining state law claims is purely discretionary. See Carlsbad Tech. Inc. v. HIF Bio, Inc., 556 U.S. 635, 640 (2009) (statutory supplemental jurisdiction over state law claims may be exercised at court's discretion after dismissal of federal claims); 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction where all claims over which it had original jurisdiction are dismissed). When federal claims are eliminated before trial, district courts should usually decline to exercise supplemental jurisdiction for reasons of comity and judicial economy. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1046 (9th Cir. 1994). Accordingly, the undersigned recommends that the court decline to exercise supplemental jurisdiction over plaintiff's Claims One, Two, Three, Four and Eight.

Plaintiff cannot establish original jurisdiction over her state law claims, thus avoiding dismissal, by alleging in support of relief that defendants violated HIPAA or federal regulations. Such allegations do not transform a tort or contract cause of action, governed by state law, into a federal claim. See Merrell Dow Pharm. v. Thompson, 478 U.S. 804, 817 (1986) (alleging violation of federal law as an element of a state cause of action does not establish federal question jurisdiction where Congress has determined there should be no private cause of action under the statute). Because HIPAA does not create a private cause of action, plaintiff may not assert it as the basis for liability on a state law claim. See In re Anthem, 129 F.Supp.3d 887, 897 (N.D. Cal. 2015) (quoting Huling v. City of Los Banos, No. 1:11-cv-01797 LJO, 2012 U.S. Dist. LEXIS 8765, 2012 WL 253251, at *8 (E.D. Cal. Jan. 25, 2012)). Because Claims One through Three expressly state causes of action which are governed by state law—fraudulent concealment, negligence, intentional infliction of emotional distress and breach of contract—jurisdiction is entirely discretionary and should be declined. Claim Eight, fraudulent concealment, is not saved from the same result by plaintiff's allegation that the alleged obstructive conduct also violated 42 U.S.C. § 1985, ECF No. 1 at 92, for the reasons explained above in discussion of Claim Five.

In sum, Claims One through Four and Claim Eight present state law causes of action

despite any internal references to alleged violation of federal requirements. Because plaintiff's federal claims must be dismissed without leave to amend, the court should decline to exercise jurisdiction over these claims. And because the complaint should accordingly be dismissed in its entirety, the undersigned does not reach the numerous other grounds for dismissal which are raised by the motions.

## IV. Pro Se Plaintiff Summary

The magistrate judge is recommending that defendants' motions to dismiss be granted. It is further recommended that you not be given leave to amend, as your federal claims could not be fixed by amendment. You cannot maintain Section 1983 claims against Kaiser or the individual doctors because none of them are state actors or were using state authority when they did the things you are suing them for. You cannot state a RICO claim because the conduct you are suing over does not legally amount to fraud. Because these claims must be dismissed, there is no reason for the federal court to consider your other claims, which all arise under state law. The district judge will make the final decision about this recommendation. See below for instructions on how to object.

## V. Conclusion

For the reasons stated above, it is HEREBY ORDERED that plaintiff's motions for leave to file surreplies (ECF Nos. 22, 35) are DENIED.

It is FURTHER RECOMMENDED that:

1. Defendants' motions to dismiss (ECF Nos. 18 and 30) be GRANTED without leave to amend;
2. This action be DISMISSED; and
3. The clerk of the court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and

Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991). **Due to exigencies of the court's calendar, extensions of time to object are disfavored. The parties are informed that objections need only specify the portion of the Findings and Recommendations to which objection is made. Additional briefing is not required.**

DATED: August 25, 2026

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE